IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 1, 2011

**STATE OF TENNESSEE v. BRONCHE BLAIR**

**Direct Appeal from the Circuit Court for Madison County**
**No. 10-99     Roger A. Page, Judge**

**No. W2010-01285-CCA-R3-CD   -   Filed April 13, 2011**

The defendant, Bronche Blair, was convicted by a Madison County Circuit Court jury of second degree murder, a Class A felony, and was sentenced as a Range I, violent offender to twenty-five years in the Department of Correction. On appeal, he argues that the evidence was insufficient to sustain his conviction and that the trial court imposed an excessive sentence. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Bronche Blair.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Benjamin C. Mayo, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Around 9:30 p.m. on March 21, 2009, Jackson police officers responded to a report of a shooting in the parking lot belonging to several businesses, including Aloha Pools and Spas, Scores nightclub, a "Mexican club," Logan's restaurant, and O'Charley's restaurant. At the location, they found the victim, Burnest Batchelor, who had suffered three gunshot wounds, lying on the ground beside the open driver's door of a blue, two-door Ford

Thunderbird vehicle. After investigation, the defendant and a co-defendant[1] were indicted on one count of first degree murder during the attempted perpetration of especially aggravated robbery and one count of attempted especially aggravated robbery.

At the defendant's trial, Officer Kenneth Reeves with the Jackson Police Department testified that the paramedics arrived at the scene at the same time as he did, and when they put the victim on a stretcher, he saw a .380 caliber handgun underneath the car. The gun was loaded, and the serial number had been filed off. The glass of the vehicle's rear window was shattered from an apparent bullet hole. On the passenger's seat inside the vehicle was a large black plastic bag full of marijuana and, in the glove compartment, a small plastic bag containing several smaller baggies. Officer Reeves noted that the presence of a large amount of marijuana along with multiple baggies indicated that the marijuana was being packaged for resale. Four spent shell casings were found on the ground outside the vehicle's rear passenger side, and a fifth spent shell casing was found inside the vehicle near the center console. All of the spent shell casings were nine-millimeter, and there was no evidence that the .380 had been fired.

Officer Annette Cepparulo of the Jackson Police Department testified that she was responsible for collecting evidence at the scene, including, among other things, the nine-millimeter spent shell casings and the "Hi-Point .380 ACP handgun" containing three live rounds in the magazine. The victim's wallet was recovered from his rear pocket, and it contained thirty-six dollars. Officer Cepparulo stated that the officers conducted a thorough search of the area, and no evidence was discovered indicating that the .380 had been fired. On cross-examination, Officer Cepparulo noted that the .380 was found within arm's reach of where the victim was lying on the ground.

Lieutenant Mike Turner, evidence custodian and crime scene investigator for the Jackson Police Department, testified that he processed the Ford Thunderbird, which consisted of taking photographs, searching for potential evidence, and dusting for fingerprints. Lieutenant Turner also inserted rods in the bullet holes in the vehicle in an attempt to determine the trajectory of the bullets. There was a bullet hole in the rear window of the vehicle, and a bullet impact area on the trunk deck. The bullet hole in the rear window aligned with a bullet hole in the top of the rear seat and toward the driver's door. Given that there was no damage to the driver's door, Lieutenant Turner surmised that the bullet either hit the victim or the door was open and the bullet continued out the door. Rods inserted into two bullet holes in the driver's seat indicated that the bullets did not penetrate the seat but, instead, possibly hit the metal seat frame and fragmented. One small bullet fragment was recovered from the driver's seat underneath a cap. Lieutenant Turner lifted

---

[1] The defendants' cases were severed for trial.

fingerprints and a palm print from the vehicle's passenger side rear quarter panel, rear passenger side window, and the frame of the passenger door.

Deputy Lisa Carroll Hedin with the Madison County Sheriff's Department testified that she obtained samples of the defendant's fingerprints and palm prints. Aimee Oxley, latent fingerprint examiner with the Jackson Police Department, then compared the defendant's known prints to the prints found on the Thunderbird by Lieutenant Turner. Oxley determined that the print found on the vehicle's rear passenger side window matched the defendant's prints.

The State and the defendant agreed to stipulate that the autopsy of the victim reported that he sustained three gunshot wounds. One of the gunshots entered the right side of the victim's chest and exited through his left flank, injuring his liver, duodenum, pancreas, and left kidney. Another gunshot entered the victim's left upper arm, where a "distorted, nonjacketed, and small caliber bullet was lodged." One gunshot "superficially perforated and exited the back of the right wrist of [the victim], causing extensive fractures of his right wrist." The sequence in which the victim sustained the wounds could not be determined, but the cause of the victim's death was multiple gunshot wounds. A toxicology profile did not detect the presence of any alcohol or drugs in the victim's system.

Lieutenant Tyreece Miller, supervisor of the Violent Crimes Unit of the Jackson Police Department, testified that during the course of his investigation, the defendant; Marc Bradford, the co-defendant; and Shaunte Blair were developed as suspects. Lieutenant Miller interviewed the defendant multiple times during his investigation. In the defendant's first statement to Lieutenant Miller, the defendant admitted to buying marijuana from the victim on a couple of occasions, the last time being the day of the murder. The defendant said that three unknown men in black clothes approached him after he purchased the marijuana and indicated that they wanted to rob the victim. The defendant stated that he refused to join the men in robbing the victim, and he surmised that those men had shot the victim.

The defendant made another statement to the police later that same day, in which he said that he met the victim the night of the incident in the Scores nightclub parking lot to buy a quarter pound of marijuana from him. The defendant's brother, Shaunte Blair, and his friend, Marc Bradford, were with him and waited in the car while the defendant got into the victim's car. The defendant claimed that while he was "checking" the marijuana, the victim pulled out a gun and told the defendant to "drop it off," which indicated a robbery. The defendant already had his hand on his own gun, a nine-millimeter, in his pocket, so he pulled it out and shot the victim. The defendant said that he shot the victim "three or four times because he was shooting at me, too." The defendant stated that he and his brother, who had

gotten out of their car, ran behind the buildings and Marc Bradford picked them up.

Lieutenant Miller stated that the defendant gave another statement in between the aforementioned statements; however, the defendant did not sign that statement and it was therefore not adopted by him. In that statement, the defendant implicated two different friends but still admitted to shooting the victim after the victim attempted to rob him. The defendant did not indicate in that statement that the victim fired any shots at him.

Special Agent Steve Scott, firearms examiner with the Tennessee Bureau of Investigation, testified that he examined the ballistic-type evidence recovered in this case. A bullet core retrieved from the victim at autopsy was consistent with a nine-millimeter, but given it did not have its shell casing, it contained no markings from the firearm that shot it. A bullet fragment found in the victim's vehicle was inconclusive. A bullet retrieved from the hospital was a nine-millimeter and bore markings which indicated that it could have been fired from a weapon made by a number of different manufacturers, including Beretta but excluding Hi-Point. Agent Scott determined that the five nine-millimeter spent cartridge casings recovered at the scene were all fired from the same firearm, which was not the Hi-Point .380 handgun. However, the Hi-Point was loaded and operable when he received it.

The defendant elected not to testify or present any proof.

After the conclusion of the proof, the jury found the defendant guilty of the lesser-included offense of second degree murder and acquitted him on the charge of attempted especially aggravated robbery.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that there was no proof he shot the victim "knowingly" and that the State failed to negate his theory of self-defense. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Whether the defendant "knowingly" killed the victim is a question of fact for the jury. See State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer intent from the character of the offense and from all the facts and circumstances surrounding the offense. See id. at 105 (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

At the time of the offense, the self-defense statute provided:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

-5-

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (Supp. 2009).

When the defense of self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. See id. § 39-11-201(a)(3); State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). However, whether a defendant acted in self-defense is a question of fact for the jury to determine. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within the prerogative of the jury to reject a claim of self-defense. Goode, 956 S.W.2d at 527.

In the light most favorable to the State, the evidence shows that the defendant arranged to meet the victim to consummate a drug transaction and, during that transaction, fired his weapon five times, hitting the victim three times. The proof shows that the killing was knowing, as the defendant's statement indicates that he purposefully shot the victim, albeit his claim was that it was in self-defense. However, contrary to the defendant's assertion of self-defense is the proof that shows no shots were ever fired from the victim's alleged weapon even though the defendant claims that the victim's gun was drawn and aimed before the defendant even removed his gun from his pocket. That a gun was found on the scene within arm's reach of the victim suggests, instead, that the victim was unsuccessful in his attempt to defend himself from an attack by the defendant. In sum, the defendant's claim that he only shot the victim after the victim pulled a gun on him was before the jury, and the jury, as its prerogative, did not believe the defendant's claim. We conclude, therefore, that the evidence was sufficient to sustain the jury's verdict.

## II. Sentencing

The defendant also argues that the twenty-five-year sentence imposed by the trial court was excessive in that the court applied inappropriate enhancement factors and failed to apply a mitigating factor. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2010). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

Here, the trial court enhanced the defendant's sentence based on a finding that he was a leader in the commission of the offense involving two or more criminal actors, Tenn. Code Ann. § 40-35-114(2); he possessed a firearm during the commission of the offense, id. § 40-

35-114(9); and he had no hesitation about committing a crime when the risk to human life was high, id. § 40-35-114(10). The court gave middle weight to the factor that the defendant was a leader, which it found because the defendant's younger brother, Shaute Blair, and a friend, Marc Bradford, were involved in the offense, but the defendant was the one who possessed the firearm, having taken it from Bradford's home without his knowledge, and was the one who shot the victim. The court gave the most weight to the factor that the defendant possessed a firearm during the commission of the offense, noting that the defendant clearly brought a firearm to the encounter and that the victim would be alive had he not done so. The court gave the least weight to the factor that the defendant committed the offense when the risk to human life was high. With regard to that factor, the court observed that the defendant's conduct had to put people other than the victim at risk for the factor to apply. As such, the court noted that the record showed that the defendant fired gunshots in a parking lot at 9:20 on a spring evening within range of where other people were present.

Defense counsel argued that the trial court apply as mitigation that the defendant's youthfulness, as evidenced by his age and mental capacity, indicated that he lacked substantial judgment in committing the offense. See id. § 40-35-113(6). The court, however, discounted the defendant's argument, noting that the factor should not apply in a situation where "we have an individual who was the leader in committing this offense, who brought the gun to the encounter, who had been buying marijuana from this victim . . . . And I think this factor applies when someone doesn't have judgment and doesn't know exactly what they're doing and doesn't plan." Based on the presence of three enhancement factors, in particular the defendant's use of a firearm, and the absence of any mitigating factors, the trial court sentenced the defendant to twenty-five years, the maximum in the range, concluding that "this was a very dangerous individual who committed this offense and that he should be kept away from the rest of us for as long as possible."

The defendant challenges the trial court's application of the factors that he was a leader in the commission of the offense and that he had no hesitation about committing a crime where the risk to human life was high to enhance his sentence. However, from the defendant's statement to police, the evidence shows that the defendant's friend and younger brother went with him to meet the victim and that his brother was also out of the vehicle and ran away with the defendant on foot until they were picked up by the defendant's friend. This was sufficient evidence for the trial court to find that the defendant was a leader.

As to the factor regarding the defendant's having no hesitation about committing a crime where the risk to human life was high, the evidence is somewhat slim, consisting of a statement in the presentence report that there were two employees of a nearby restaurant who were outside at the time of the shooting and witnessed the offense. It is conceivable that if these two people were in a position to observe the incident, then they were also in a

position where they could be injured.  Regardless, the trial court clearly gave the most weight to the enhancement factor that the defendant used a firearm in the commission of the offense and even said that it was "especially" relying on that factor.  As such, we discern no abuse of discretion in the trial court's enhancement of the defendant's sentence.

The defendant also argues that the trial court erred in failing to consider, as mitigation, that because of his youth, he lacked substantial judgment in committing the offense.  He argues that, in addition to his age, his history of counseling, mental health diagnoses, and borderline mental retardation contributed to his falling within the concept of "youth."  However, the record clearly shows that the court considered the defendant's arguments with regard to this mitigating factor and was aware of the defendant's aforementioned history, yet found that the defendant did not lack substantial judgment in committing the offense due to his youth.  Upon review, we cannot conclude that the trial court erred by not applying the defendant's youth as a mitigating factor.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-9-